Earl, J.
Upon the trial of this action there was evidence proving or tending to prove these facts: On the 21st day of July, 1877, the plaintiff delivered to the defendant, at Toledo, in the state of Ohio, a large number of cattle and hogs to be transported within a reasonable time over its railroad to Buffalo in this state, there to be delivered to him.
The usual and ordinary time for the transportation of such freight between the two places named was about twenty-five hours. The plaintiff’s cattle and hogs were started on a train of defendant’s cars for their destination, and were carried with reasonable dispatch and -without delay, so far as Collingswood in the state of Ohio, where they arrived on the 22d day of July. Collingswood was a place where it was usual and customary for the defendant to stop all its stock trams for the purpose of changing engines, engineers, firemen and crews employed on such trains; and the train on which plaintiff’s stock was shipped stopped there for the purpose of making such usual changes.
*515 When plaintiff’s stock arrived there the defendant was willing and desirous to proceed and continue the carrying of the stock to Buffalo, and had all the necessary cars, locomotives and employees to make up and manage the train; but it was prevented from proceeding immediately and accomphshing in the usual time the carriage of the stock to its destination in consequence of a portion of its employees striking and refusing to run the train or to permit others so to do.
A few weeks prior to the arrival of the plaintiff’s stock at Collingswood, the defendant made an order reducing the pay of its employees engaged on its trains and at their stations and shops ten per cent; and by reason of such reduction many of the employees refused to work on defendant’s trains or to permit others to work who were willing to; and many of the firemen and brakemen who had been in the defendant’s employ took forcible possession of some of defendant’s, engines, and some of the fixtures of the engines, and detached engine hose, let the water out of the engine boilers, uncoupled cars, carried away and hid some coupling pins and links, placed the engines in the roundhouse, and barricaded the same. The persons who took such forcible possession of the property of «the defendant were a great number—over 200 persons—the greater portion of whom were firemen and brakemen who had been in the employ of the defendant up to the time of the strike on the 22d day of July, and were the controlling element of the force which prevented the moving of defendant’s trains at Collingswood. Such persons boldly and defiantly refused to obey any of the orders of the defendant’s officers, and refused to permit any of the defendant’s trains to be moved, and threatened persons who should attempt to move any of the trains or cars until the demands of the strikers should first be complied with. The officers of the defendant made various attempts to move trains from Collingswood, and placed on the trains employees who were willing to work and operate the same; but they were prevented from moving the trains by threats, and were compelled to desist from all attempts to move them from Collingswood.
During all the time from the day the stock arrived at Collingswood until it was finally reshipped, the officers of the defendant exerted themselves with great diligence to move the trains, and to induce and persuade those who up to that time had been in the employ of the defendant to return to their places on the trains, and to permit the defendant to have the use and control of its property, the railroad, and its fixtures; but they openly declared and announced that they would do so only upon the condition that the order of *516 the defendant reducing the wages of the employees should be annulled, and the wages restored as they were before the reduction. They also demanded the annulling of the rule requiring certain qualifications of engineers, and the removal of the general master mechanic, and that no one should be discharged for having taken part in the riot. And the strikers would have disbanded, and the late employees of the defendant would have promptly resumed their employment with the defendant, and would have ceased all force and violence to the defendant, its officers and employees, and would have allowed and restored to the defendant the full and complete control of all its property and its railroad, had their demands been acceded to; but the defendant refused to accede to the demands. There was a sufficient number of other competent workmen willing and ready to take the places of the strikers at such reduced wages, who could at any time have been so employed, and who would have moved defendant’s train, except for the violent opposition of the strikers. After the strike had continued for a period of eleven days it ceased, and all the late employees of the defendant who were engaged in the strike resumed work on the defendant’s cars, and the defendant was restored to the possession of all its property and railroad and fixtures so taken possession of by the strikers; but the wages were not restored, nor other concessions made by the defendant.
If it had not been for those who had been in the employ of the defendant up to the time of the commencement of the strike, the defendant could have overcome the resistance, and transported plaintiff’s stock in due and ordinary time. As soon as the strike ceased, the defendant transported the plaintiff’s stock to Buffalo, and there delivered it to the plaintiff, who took possession of it. The plaintiff suffered great damage from the delay, to recover which this action was commenced.
The trial judge, among other things, charged the j'ury: “That if the strike had its origin in the minds of the defendant’s employees, that it begun with them, and terminated when they were ready to end it, and that if strangers, outside parties, joined them through sympathy or other cause, the defendant is not exempt and the plaintiff may recover damages;” “that whether the delay in bringing forward this train arose because the defendant’s engineers brakemen and firemen, were on a strike, dechning to work and the company had not men to carry on its business, or that they would not do it, or suffer others to do it, even though they were active in their resistance, although they committed violence, if they ./were the servants or employees of the defendant, nevertheless it is imputable to the defendant in *517 this case;” “that if the defendant’s employees were willing to carry on the business, and other men who have been mentioned sought to prevent those who were willing to work from carrying on its business, and continuing their labor, and that it was effective and sufficient to prevent those who were willing from going into the employ of the company, and that combination was strong and powerful, strong in its moral position, strong in its physical power to overmaster and control the situation and prevent the company from bringing out its engines and starting out the trains, and extended from Cleveland to Buffalo, embracing Erie, it is no excuse for the delay, because if the strikers were the defendant’s employees, they represented the defendant; they were its servants and agents, and their acts were of the corporation.”
To all these portions of the charge defendant’s counsel excepted; and he requested the judge to charge “that if the jury believe from the evidence that the cattle were delivered in Buffalo at as early a day as was possible under all the circumstances in the- case they will find for the defendant;” “that if the jury believe from the evidence that on and after the 21st day of July, 1877, the railroad tracks, depots and rolling stock of the defendant were taken forcible possession of by a body or bodies of armed men, among whom were some of its employees, and that they continued to hold possession thereof by force of arms for several days, by reason of which the delivery of the plaintiff’s stock at Buffalo was delayed until August 4, 1877, the plaintiff cannot recover;” “that if the jury believe from the evidence that under the circumstances the defendant could not have moved the plaintiff’s stock from Collingswood to Buffalo, previous to the time it did, without endangering fife and property, then the defendant was justified in delaying the delivery of the stock until it was actually delivered;” “that if the cause of the detention of the plaintiff’s stock arose from forcible resistance of the late employees of the defendant, the defendant having at all times a sufficient force of faithful employees to have operated and run the defendant’s road had it not been for such forcible resistance, then the plaintiff cannot recover;” “that if any of the employees of the defendant joined the strikers, they ceased from that time to be employees of the company, and the defendant is not in any way responsible for their acts.”
The judge declined to charge each of these requests, and the defendant’s counsel duly excepted. The jury rendered a verdict for the plaintiff. The defendant appealed to the general term and from affirmance there to this court.
Daniel H. McMillan, for app’lt; Adelbert Moot, for resp’t.
*518 Earl, J. We are of opinion that the learned trial judge fell into error as to rules of law of vital and controlling importance in the disposition of this case. A railroad carrier stands upon the same footing as other carriers, and may-excuse delay in the delivery of goods by accident or misfortune not inevitable or produced by the act of God. All that can be required of it in any emergency is that it shall exercise due care and diligence to guard against delay, and to forward the goods to their destination; and so it has been uniformly decided. Wibert v. New York and E. R. Co., 12 N. Y., 245; Blackstock v. New York and E. R. Co., 20 id., 48. In the absence of special contract, there is no absolute duty resting upon a railroad carrier to deliver the goods intrusted to it within what, under ordinary circumstances, would be a reasonable time. Not only storms and floods and other natural causes may excuse delay, but the conduct of men may also do so. An incendiary may burn down a bridge, a mob may tear up the tracks, or disable the rolling stock, or interpose irresistible force or overpowering intimidation, and the only duty resting upon the carrier, not otherwise in fault, is to use reasonable efforts and due diligence to overcome the obstacles thus interposed, and to forward the goods to their destination.
While the court below conceded this to be the general rule, it did not give the defendant the benefit of it because it held that the men engaged in the violent and riotous resistance to the defendant were its employees, for whose conduct it was responsible; and in that holding was the fundamental error committed by it. It is true that these men had been in the employment of the defendant. But they left and abandoned that employment. They ceased to be in its service, or in any sense its agents for whose conduct it was responsible. They not only refused to obey its orders, or to render it any service, but they willfully arrayed themselves in positive hostility against it, and intimidated and defeated the efforts of employees who were willing to serve it. They became a mob of vicious lawbreakers, to be dealt with by the government, whose duty it was, by the use of adequate force, to restore order, enforce proper respect for private property and private rights, and obedience to law. If they had burned down bridges, torn up tracks, or gone into passenger cars and assaulted passengers, upon what principle could it be held that, as to such acts, they were the employees of the defendant, for whom it was responsible? If they had sued the defendant for wages for the eleven days when they were thus engaged in blocking its business, no one will claim that they could have recovered.
It matters not if it be true that the strike was conceived *519 and organized while the strikers were in the employment of the defendant. In doing that, they were not in its service, or seeking to promote its interest, or to discharge any duty they owed it, but they were engaged in a matter entirely outside of their employment, and seeking their own end, and not the interests of the defendant. The mischief did not come from the strike—from the refusal of the employees to work—but from their violent and unlawful conduct after they had abandoned the service of the defendant.
Here, upon the facts which we must assume to be true, there was no default on the part of the defendant. It had employees who were ready and willing to manage its train, ana carry forward the stock, and thus perform its contract and discharge its duty, but they were prevented by mob violence, which the defendants could not by reasonable efforts overcome. That, under such circumstances, the delay was excused has been held in several cases quite analogous to this, which are entitled to much respect as authorities. Pittsburgh, Ft. W. and C. R. R. Co. v. Hazen, 84 Ill., 36; Pittsburgh, C. and St. L. R. Co. v. Hollowell, 65 Ind., 188; L. S. and M. S. R. R. Co. v. Bennett, 89 id., 457; 6 Am. & Eng. R. Cases, 391; I. and St. L. R. R. Co. v. Juntgen, 10 Brad., 295.
The cases of Weed v. Panama R. R. Co., (17 N. Y., 362, and Blackstock v. N. Y. and Erie R. Co. (1 Bosw., 77; aff’d in 20 N. Y., 48), do not sustain the plaintiff’s contention here. If, in this case, the employees of the defendant had simply refused to discharge their duties, or to work, or had suddenly abandoned its service, offering no violence, and causing no forcible obstruction to its business, those authorities could have been cited for the maintenance of an action upon principles stated in the opinions hi those cases..
We are, therefore, of opinion that this judgment should should be reversed and a new trial granted, costs to abide event.
All concur.