[Civ. No. 3738.   Second Appellate District, Division One.—November 26, 1921.]

## AMERICAN FRUIT DISTRIBUTORS OF CALIFORNIA (a Corporation), Respondent, v. WALKER D. HINES, Director-General of Railroads, et al., Appellants.

[Civ. No. 3739.   Second Appellate District, Division One.—November 26, 1921.]

## AMERICAN FRUIT DISTRIBUTORS OF CALIFORNIA (a Corporation), Respondent, v. WALKER D. HINES, Director-General of Railroads, et al., Appellants.

[1] RAILROADS—FEDERAL CONTROL—BREACH OF CONTRACT—NONLIABILITY OF OWNERS—PLEADING—PARTIES.—Owners of transportation companies during the time that the companies were under federal control pursuant to the act of Congress and presidential proclamation were not liable for the breach of any contract or the failure to keep any obligation imposed upon the carrier, and in an action

for such a breach or default the Director-General of Railroads is the only proper party defendant.

[2] COMMON CARRIER—INSURER—EXCEPTION.—The obligation assumed by a common carrier of freight or merchandise is that of an insurer, except that it is not liable where extraordinary occurrences not within its control produce the damage.

[3] ID.—NEGLIGENCE—EXEMPTION FROM LIABILITY.—A carrier may not contract to free itself from damages caused by its own negligence.

[4] ID.—INTERSTATE COMMERCE—EXEMPTION FROM LIABILITY—SCOPE OF CONTRACT.—While under the Carmack Amendment of 1906 and under the Cummins' Amendment of 1915 a carrier engaged in interstate commerce is liable for the full loss, damage, or injury to a shipment caused by it or by any connecting carrier, an initial carrier may contract for exemption from liability for damage where there is no negligence on its part or on that of the connecting carrier.

[5] ID.—BILL OF LADING—EXEMPTION ON ACCOUNT OF STRIKES—BINDING STIPULATION.—A provision in a bill of lading stipulating that the carrier should not be responsible for loss or damage occurring from riots or strikes is binding on the shipper.

[6] ID.—STRIKE OF EMPLOYEES—CARE OF SHIPMENT—DUTY OF CARRIER.—Irrespective of a provision in a bill of lading that the carrier should not be liable for loss or damage from strikes, it is liable for delay on account of a strike of its employees unless it uses all reasonable efforts to preserve the shipper's property and to cause it to be transported to its destination.

[7] ID.—ACTION FOR LOSS OF SHIPMENT—STRIKE—EVIDENCE—BURDEN OF PROOF.—In an action for the loss of a shipment caused by a strike of employees, the plaintiff makes out a *prima facie* case by showing the fact of shipment and the failure to deliver to destination, regardless of the stipulation in the bill of lading exempting liability for strikes, and the burden of proving exonerating facts is on the carrier.

[8] ID.—EXONERATION OF CARRIER.—Where a carrier after a strike which is brought about through no fault of the employer uses every reasonable effort to fill the places of the strikers, and every reasonable effort to obtain men and means to care for property intrusted to it for shipment, which property is lost or destroyed while in its charge, the exceptional conditions of violence, riots, intimidations, act of God, etc., may then be deemed to have been established and exoneration from liability will follow.

4. Carmack Amendment as affecting liability of initial carrier, notes, Ann. Cas. 1915B, 80, 92; Ann. Cas. 1917C, 939.

Validity and effect of stipulation limiting carrier's liability for delay caused by strikes, etc., note, Ann. Cas. 1915C, 1189.

APPEALS from judgments of the Superior Court of Los Angeles County. J. P. Wood, Judge. Affirmed and reversed.

The facts are stated in the opinion of the court.

W. I. Gilbert for Appellants.

James E. Kelby for Respondent.

JAMES, J.—The causes above entitled were brought in the superior court and by agreement of the parties the evidence heard and stipulations made were deemed to apply in both. Judgments were rendered in favor of the plaintiff, from which judgments defendants have appealed. The questions presented on appeal are the same in both cases; hence the two appeals will be considered together.

The actions were to recover from the defendants the value of certain shipments of cantaloupes amounting in all to about twelve carloads. Each carload was billed as a separate shipment and bills of lading were issued to the consignor. The cantaloupes were received by the carrier at Chatsworth, in the county of Los Angeles, but ·were not transported to their destination; in fact, none proceeded farther on their way than to reach the yards of the carrier at Los Angeles. It was pleaded in defense that a strike occurred in the Los Angeles yards, which prevented the cantaloupes from being transported in accordance with the shipper's directions. A term of the bill of lading was relied upon and pleaded, which purported to exempt the carrier from responsibility where a strike intervened to obstruct its functions. The contract being for interstate shipment, there is no dispute but that the Interstate Commerce Act, in so far as its provisions affect the rights and obligations of the respective shipper and carrier, will control. At the commencement of the trial stipulations were made as to certain facts. It was agreed that on the twentieth, twenty-first, and twenty-second days of August, 1919, there were delivered to the carrier for shipment cantaloupes in the quantity alleged, and that the same were received for transportation to points outside of the state of California, and that bills of lading were issued to the shipper covering the twelve cars which contained the shipment. It was fur-

ther stipulated that the cantaloupes *were never delivered at their destination* and a stipulation was also made covering the value thereof, in the event judgment should be rendered for the plaintiff. Plaintiff thereupon rested its case and the defendant proceeded in the effort to establish its defense of nonliability. The assistant superintendent of the carrier's lines at Los Angeles testified that on the evening of the twenty-first day of August, 1919, switchmen doing service in the freight-yards of the Southern Pacific Company at Los Angeles went on strike; that the men walked out at 6 o'clock on that day and that the official had no information prior to that time that the strike was to occur; that when he received notification of the happening he was at some distance from Los Angeles, and that he returned at once, arriving at 2 o'clock in the morning, when he found officers of the division, eight or ten in number, engaged in endeavoring to get out passenger trains; that several sections of passenger trains were gotten out, when train and engine men began to refuse to respond to call for service. The witness stated that there were no freight trains run after 6 o'clock in the evening of August 21st, as the trainmen refused to accept call, "claiming that they were endangering their lives by going out on the road under the existing conditions"; that on the day following he talked with several train and engine men and was told by them that they did not consider it safe to go out on the road; that at that time there were employed on the Los Angeles division 225 engineers and that all of them refused to work; that it was necessary to have engines to handle the yard work, make up the trains, and carry the latter out on the road; that within the forty-eight hours ensuing after the strike was called by the switchmen all of the engineers refused to continue work; that the firemen followed suit; that railway officials took the list of firemen and engineers and called them all and failed to get a response from one willing to work from the entire list. The witness stated that the same situation existed with respect to brakemen, all of whom failed to respond when called to take their trains. By the evening of August 22d the officials were unable to get any men to take trains out. The witness stated further: "I do not know personally of any action that was taken by the company employees with reference to threats

of violence; only what I was told. I didn't see any of it myself. There were no men obtainable here to take the places of the men on strike. To have gotten men here from other places, we would have had to go east, and it would have taken at least one week to get men here. . . . The reason I knew that there were not men available for the performance of those duties in Los Angeles, was that we are guided largely by the applications that are received. In making my answer to that former question I had that in mind. That, and the fact that the labor trouble had been in existence for several days and we knew that any available supply was absorbed by them. That was my conclusion. I spoke from past experience.'' The trainmaster who was in charge at the Los Angeles terminal testified that the morning after the strike there were 2,807 cars of freight in the Los Angeles yards. One train was made up and departed at 6:30 P. M., and that no other freight trains went out, as there was no one to make the trains up. This witness testified that at some point in the city a switchman named Day had been killed on the night of the 21st. Witness stated that he had assisted in making up passenger trains, being protected by a police officer meanwhile. He stated that after the strike was called and after the main tracks had been cleared and some livestock unloaded on the 22d, the last remaining yardmasters joined the strike and left the witness entirely alone at the work. ''I was not interfered with except a committee appointed by the strikers to come out to my residence and use their endeavors to persuade me to join the ranks of the strikers,'' he said. ''There was no violence offered me. But I was afraid to go down from the feeling of the men at that particular moment.'' He testified that a striking switchman was shot, but that he did not learn who did the shooting nor pay any attention to it. From the further statement of the witness it appeared that that shooting of the switchman did not happen about the freight-yard, but near the Pacific Electric line, an independent carrier. Other officials testified that the trainmen had objected to taking trains out, on the ground that they were afraid their lives were in danger, although there was no direct evidence of any threats of violence offered by the strikers. In an endeavor to show that the refrigerating of the cars containing the cantaloupes

was attempted to be done, a witness, whose duty it was to supervise the icing of the cars, testified that, failing to secure switch engines with which to move cars to the ice plant, an attempt was made to haul ice by trucks, but that the ice men finally stopped work at the instance of some man who was evidently associated with the striking switchmen. There was testimony of another man, whose position was that of an inspector, that the ice men were accosted by men from the Labor Temple who told the former that it would be the best thing for them to "get out, because there would be friction in the yard if they did not, and told them that the best thing to do was to work along with the regular switchmen who had walked out, because if they didn't it would make it very uncomfortable for them even after the switchmen went back to work. . . . There were no exact threats made against me or the boys who stayed on the job"; that the ice men thereupon left the yards. Another official testified that a "local chairman" of the engineers had said that he would not instruct an engineer to go to work, because of the danger, and when asked as to what danger he referred to, said, "Well, the fact that the officials are working on there, these fellows are liable to mob violence if they go out on that engine." The latter official further testified: "I should say it took from two to three years for an engineer to acquire sufficient knowledge of an engine to operate it with safety to himself and to the equipment. In order to start to work in the yard it would require a thorough knowledge of all the tracks and switches and whistle signals where we whistle for various tracks, which all requires possibly two or three weeks' steady work before he would know those in one portion of the yard, and then he would not know all of the yard." It was shown that the only cause which precipitated the strike of the switchmen was that the latter objected to handling freight transferred to the defendant carrier by the Pacific Electric Railway, which latter was then having strike trouble with its men.

[1] Defendants first advance the proposition that the judgments, as against both the Southern Pacific Company and the Director-General of the Railroads, cannot be sustained. The argument to this point is, briefly, that the owning corporation, having been superseded in the management

and control of its property, cannot be held responsible for the breach of any contract or the failure to keep any obligation imposed upon the carrier. It is admitted that, at all of the times material to the causes of action with which we are here concerned, the United States government held complete control of the transportation facilities of the defendant company, and that the handling of all freight was governed by a Director-General, acting on behalf of the President of the United States. The counsel for respondent pays scant attention to this proposition, in that behalf contenting himself with the observation that one or the other of the defendants is liable, and that it is immaterial to his client as to which may be required to ultimately respond to the judgment. However, the proposition is fairly advanced by the appellants, and requires consideration at the hands of the court, even though we are left without the help of respondent's counsel in reaching a decision on the question. The act of Congress of August, 1916, was an emergency measure designed to facilitate the handling of troops and war supplies. It authorized the President "in time of war" to take possession of systems of transportation or any part thereof, and to use the same for the carrying of troops and war material to the exclusion of other traffic as far as was necessary. In December, 1917, the President issued a proclamation wherein he declared that necessity existed for the taking possession of every system of transportation located wholly or in part within the boundaries of continental United States, and appointed a Director-General to represent the government as the managing head of the combined transportation facilities. The proclamation further provided that no attachment or writ of execution should be levied against any of the properties of the transportation systems, but that suits might be brought against the carriers and judgments rendered as theretofore "until and except so far as said Director may, by general or special orders, otherwise determine." In March, 1918, Congress supplemented the act referred to with comprehensive legislation which provided for adjustment of the business relations between the government and the owners of the transportation systems, and provided that the government control, then acknowledged by the act to be existing, should continue for a maximum period of not

longer than the end of one year and nine months following the proclamation of the President declaring a peace treaty to have been ratified. Section 10 of that act contained a provision which, in its interpretation by the courts, has resulted in entirely different conclusions being announced in the decisions as to the liability of the owners of the transportation facilities during government control. We quote that portion of the section material to the point: "The carriers while under federal control shall be subject to all laws and liabilities as common carriers, whether arising under state or federal laws or at common law. . . . Actions at law or suits in equity may be brought by and against such carriers and judgments rendered as now provided by law; and in any action at law or suit in equity against the carrier, no defense shall be made thereto upon the ground that the carrier is an instrumentality or agency of the federal government. But no process, mesne or final, shall be levied against such property under federal control." In connection with this provision, general order No. 50, made by the Director-General on October 28, 1918, is to be considered. That order provided in part as follows: "Actions at law, suits in equity, and proceedings in admiralty hereafter brought in any court based on contract, binding upon the Director-General of Railroads, claim for death or injury to person, or for loss and damage to property, arising since December 31, 1917, and growing out of the possession, use, control, or operation of any railroad or system of transportation by the Director-General of Railroads, which action, suit, or proceeding but for federal control might have been brought against the carrier company, shall be brought against William G. McAdoo, Director-General of Railroads, and not otherwise." The order further recited that its provisions should not apply to suits for the recovery of fines, penalties, or forfeitures, and that, in the actions to which it was applicable which had already been commenced and were pending against carrier companies, the pleadings might be amended by substituting the Director-General for the "carrier company." It was claimed in many suits which were brought throughout the country that under the provisions of the act of 1918 there was preserved to a plaintiff the right to sue the transportation owner; that the word "carrier" was synonymous with

owner. With this construction admitted, it was plain that order No. 50 of the Director-General was in conflict with the statute and hence invalid. On the other hand, it was as often insisted that the word "carrier" was used in the statute to designate the transportation agency and that the provision quoted was inserted only for the purpose of making clear that liability should follow the agencies, both for breach of contract and for negligent acts. Decisions agreeable to the different contentions were announced. The federal trial judges were wide apart in their conclusions. Appellate tribunals of some of the states, notably those of North Carolina, repeatedly held that the railroad owners could be sued. Counsel for appellants have cited a number of decisions holding the contrary. In our investigation of the subject we find that one suit brought in the state courts, wherein it was determined by the state appellate tribunal that the owning company could be sued was taken on writ of error to the supreme court of the United States and decision therein rendered. This decision sets at rest all conflict of authority on the question. The case was that of *Missouri Pac. R. R. Co. and Hines, Director-General,* v. *Ault,* 256 U. S. 554 [65 L. Ed. 1087, 41 Sup. Ct. Rep. 593]. It was there held that the railroad company was not a proper party defendant. The decision recognized order No. 50 as a valid exercise of the power conferred upon the Director-General. The word "carriers" occurring in section 10 of the act of 1918 was defined: "Here the term 'carriers,'" said the court, "was used as it is construed in common speech—meaning the transportation systems, as distinguished from the corporation owning or operating them. . . . If the cause of action arose while the government was operating the system the 'carrier while under federal control' was, nevertheless, to be liable and suable. This means, as a matter of law, that the government or its agency for operation could be sued, for under the existing law the legal person in control of the carrier was responsible for its acts." This decision is conclusive upon the question presented, and under the law thus established it must be held that the judgment as against the Southern Pacific Company was unauthorized and must be set aside.

[2] Broadly speaking, it may be admitted that the obligation assumed by a common carrier of freight or merchan-

dise is that of an insurer; with the qualification only that it will not be liable where extraordinary occurrences, not within its control, produce damage. At common law, in its early rigor, "acts of God and the public enemy" afforded the only defense. This obligation is still imposed wherever statutes have not changed it. It is permitted to be modified by special contracts entered into between the shipper and carrier. Under the English law it was early established that it was lawful for a carrier to modify, to some extent and in certain particulars, its liability as an insurer. The carrier on a through shipment had the right to stipulate against liability for the negligence of a connecting carrier. Amendments to the Federal Interstate Commerce Act now prohibit the contracting for such exemption. (Carmack Amendment of 1906; Cummins' Amendment of 1915; Barnes' Federal Code 1919, p. 1920.)

[3] It has always been held that the carrier may not contract to free itself from damages caused by its own negligence. [4] Generally, however, it may be now stated as a correct expression of the law that the carrier may contract for exemption from liability where the shipment is damaged without the fault of the carrier or its agencies. Nothing in the federal law forbids the making of a contract limiting liability where there is no negligence either on the part of the initial or connecting carrier. The federal statute, as amended, in its restricting phrases, refers in terms to a limitation for damage caused by the carriers themselves. The words are that liability shall accrue "for the full actual loss, damage, or injury to such property *caused by it or by any such common carrier,*" etc. And so the law, with respect to the right of a carrier to exempt itself from liability for damage occurring because of the act of some extraneous agency, remains (otherwise than as has been stated) undisturbed. In the case of *New York Cent. Ry. Co.* v. *Lockwood,* 17 Wall. (U. S.) 357 [21 L. Ed. 627, see, also, Rose's U. S. Notes], speaking of the extent to which such limiting contracts by carriers might go, Mr. Justice Bradley said: "Conceding, therefore, that special contracts, made by common carriers with their customers, limiting their liability, are good and valid so far as they are just and reasonable; to the extent, for example, of excusing them for all losses happening by accident, without any

negligence or fraud on their part; when they ask to go still further and to be excused for negligence, they have no longer any plea of justice or reason to support such stipulation. . . . The exemption claimed by carriers must be reasonable and just, otherwise it will be regarded as extorted from the owners of the goods by duress of circumstances and, therefore, not binding." (*Boston & Maine Ry.* v. *Piper,* 246 U. S. 439 [Ann. Cas. 1918E, 469, 62 L. Ed. 820, 38 Sup. Ct. Rep. 354].) Mr. Hutchinson in his work on Carriers, third edition, volume 1, chapters six, seven, treats of this subject in a comprehensive way. He cites authorities sustaining the right of the carrier to stipulate for exemption from damages caused by fire, strikes, mob, loss by thieves or robbers, also where goods are of a dangerous character. (Secs. 420–423. See, also, sec. 230 et seq., 4 Ruling Case Law, pp. 764–811.)   [5]   The provision of the bill of lading in this case, issued to the plaintiff upon shipment of its merchandise, wherein it stipulated that the carrier should not be responsible for loss or damage occurring "from riots or strikes," expressed a condition binding upon the shipper.   [6]   The mere proof of the occurrence of a strike, however, would not establish freedom from the obligation to respond in damages to the shipper. It would be incumbent upon a carrier asserting that defense to show that, notwithstanding the strike on the part of its employees, it had used every reasonable effort to preserve the shipper's property, to prevent its being damaged, and to cause it to be transported to its destination. Irrespective of limiting conditions in the bill of lading, it has been held that the occurrence of a strike among the employees of a carrier is not sufficient in itself to excuse the latter for failure to deliver goods shipped or to carry the same within a reasonable time to their destination. (*Pittsburgh, C. & St. L. W. Co.* v. *Hallowell,* 65 Ind. 188 [32 Am. Rep. 63]; *Central R. R. & Banking Co.* v. *Georgia Fruit & Vegetable Exch.,* 91 Ga. 389 [17 S. E. 904].) On the other hand, it has been held that mob violence, preventing employees from working, may excuse a carrier for like failure. (*Greismer* v. *Lake Shore etc. Co.,* 102 N. Y. 563 [55 Am. Rep. 837, 7 N. E. 828].) And in *Pittsburgh, Ft. W. & C. R. R. Co.* v. *Hazen,* 84 Ill. 36 [25 Am. Rep. 422] the court declared: "For delay resulting from refusal of the employees to do

duty, the company is responsible; for delay resulting solely from the lawless violence of men not in the employment of the company, the company is not responsible, even though the men whose violence caused the delay had, but a short time before, been employed by the company.'' In *International & G. N. R. Co. et al.* v. *Tisdale*, 74 Tex. 8 [4 L. R. A. 545, 11 S. W. 900], it was stipulated that the shipper assumed all risk of damage, injury, or loss sustained from delay or detention in transportation ''occasioned by mob, strike, or threatened violence, etc., or any other cause than the negligence of the carrier.'' The defendants offered to prove that its failure to carry and deliver livestock was due to the interference of strikers. The evidence was rejected. It was held that the ruling was error, and the court said: ''If, as was proposed by the proof offered, it could be shown that no freight or livestock trains were *or could be* run over the road, because of the interference of the strikers, it might have shown that the horse was, under the circumstances, delivered within a reasonable time, or a sufficient excuse for the failure to deliver within such time.'' The stipulated condition there was much the same as that which is expressed by the conditions of the bill of lading here. It will be noted that the court there apparently considered that it was necessary, in the making out of the defense of the carrier, that it should prove not only that livestock trains were not run over the road affected by the strike, but that none ''could be'' run, owing to strike conditions. This citation is of some aid to the point that, to entitle the carrier to justify its failure to carry the merchandise of the plaintiff, the burden was upon it not only to show the existence of a strike, but to show further that it exerted all reasonable efforts in attempting to procure men to manage trains, and that such efforts were without avail, and as to whether such efforts have been used is generally a question of fact. This question as to where the burden of proof rests, upon the issue of a strike as an excusing condition, is suggested but not decided in *Pennsylvania R. R. Co.* v. *Olivit Bros.*, 243 U. S. 574 [61 L. Ed. 908, 37 Sup. Ct. Rep. 468, see, also, Rose's U. S. Notes]. **[7]** However, the shipper, to make a *prima facie* case under the rule established by all of the leading authorities, is required to show only the fact of shipment made and a failure to de-

liver at destination. Where the carrier formerly justified under the common-law rule, the affirmative was always upon it to excuse delay by showing destruction of, or damage to, the goods to have been occasioned by "act of God or the public enemy." The effect of allowable limiting conditions in a contract of shipment is but to add to the common-law list of excepting causes modifying the obligation of the carrier as an insurer. It is familiar doctrine that the position of disadvantage occupied by a shipper, who is compelled to relinquish control of his property when he places it in the hands of the carrier, without ready means of ascertaining and fixing the blame in case of damage or destruction of his goods, is sufficient reason why he should be relieved of the duty of showing what has happened to his property. The evidence of conditions which might establish the exceptional facts necessary to relieve the carrier is within the reach of the carrier, and ordinarily not easily procurable by the shipper. The logic of all rules governing defenses of the nature here considered requires, we think, that the burden of proving exonerating facts be borne by the carrier.

The trial judge, in determining the facts, made the following findings: "14. That it is true that the failure of said defendants to safely and within a reasonable time transport and deliver said shipments, or to transport or deliver the same, and whereby the whole of said shipments were wholly lost to plaintiff, was not caused by or attributable to mob violence, riots, intimidation, the act of God, the public enemy, nor from any defect or vice in the property forming said shipments or any part thereof, nor from the violation of any duty which plaintiff owed to said shipments or the property forming the same. 15. That it is true that the failure of said defendants to transport and deliver, or transport or deliver, or preserve said shipments while awaiting, or in course of transportation, was caused solely by the negligent and wrongful acts and conduct of defendants' train service, during the course of their regular employment, in abandoning the performance of their duties." It was evidently the view of the learned judge that the defense, based upon alleged strike conditions and the limiting term of the bill of lading, could only be established by proof that the carrier was prevented from securing men

to replace the strikers and the sympathizing train operatives by mob violence and intimidation exercised by persons outside of its control. Such conditions, if they existed, would indeed assist in establishing the defense, although we are not prepared to declare that the limiting term of the bill of lading could only be invoked where there existed violence, actual or threatened, on the part of the persons disconnected from the carrier's employ. [8] We are of the view that where a carrier, after a strike which is brought about through no fault of the employer, uses every reasonable effort to fill the places of the strikers, and every reasonable effort to obtain men and means to care for property intrusted to it for shipment, *which property is lost or destroyed while in its charge,* the exceptional conditions may then be deemed to have been established and exoneration from liability will follow. From what has been said it will appear that, had the judgment rested upon the finding alone that there had been no violence, riots, or intimidation to excuse the carrier (finding 14), the issue would be left undetermined as to whether the carrier had not nevertheless been exonerated through conditions arising after the commencement of the strike which could not have been overcome by the exercise of reasonable care and diligence. Finding 15, however, determines that the failure to transport and deliver, or preserve, the shipments, "while awaiting or in course of transportation," was caused solely by the negligent and wrongful conduct of defendant's servants in abandoning the performance of their duties. This latter finding fastens liability upon the carrier, and supports the judgment. And we think that the evidence justifies it. The burden cast upon the carrier to show its freedom from fault was not sustained. The evidence does not disclose what the condition of the cantaloupes was when received other than that they were in "good" condition; nor within what time they would become valueless with or without ice; nor whether they became a total loss through deterioration; in fact, we are not told by the record as to what ultimately became of them, nor how long the strike continued. One witness for defendant testified that it would have taken a week to secure men from other points to man the trains. Whether the strike lasted that long we are not informed. Nor are we informed as to what state the cantaloupes would

have been in at the expiration of that time, all attendant conditions considered. Clearly, then, the evidence did not go far enough to establish the defense designed by the limiting terms of the bill of lading to be made available to the carrier, and the inference of negligence, as made by the findings, is clearly justified.

The judgments as against the defendant Director-General of Railroads are affirmed. The judgments as against Southern Pacific Company are reversed.

Conrey, P. J., and Shaw, J., concurred.