F. F. FRAWLEY AND A. J. SCHIMPFF, PARTNERS DOING BUSINESS
UNDER THE FIRM NAME AND STYLE OF FRAWLEY & SCHIMPFF,
RESPONDENTS, V. ATCHISON, TOPEKA & SANTA FE RAILROAD
COMPANY, A CORPORATION, APPELLANT.

St. Louis Court of Appeals.    Opinion filed October 4, 1927.

1.—Common Carriers—Carrier of Live Stock—Common-law Liability— In-
surer—Exceptions.  At common law, a common carrier receiving freight for
transportation contracts to transport the same to destination safely, and
becomes an insurer against loss or damage resulting from any cause other
than the act of God, the public enemy, or the inherent vice or nature of the
freight.

2.—Same—Same—Same—Implied Contract.  The common law implies a
contract that the freight should be delivered at destination within a reason-
able time and this duty is as obligatory as the duty to deliver safely.

3.—Same—Same—Strikes—Refusal of Servants to Work Unaccompanied by
Violence—Carrier Not Excused from Duty to Transport Freight with
Reasonable Dispatch.  It is the duty of the common carrier, accepting
freight for shipment, to transport the same with reasonable dispatch, and
the carrier is not excused from the performance of this duty by the mere
refusal of its servants to perform their work, unaccompanied by violence or
intimidation.

4.—Same—Same—Same—Same—Interstate Commerce Act—Cormack and
Cummins Amendments—Exemption from Liability by Contract—Validity.
Section 20 of the Interstate Commerce Act, as amended by Carmack and
Cummins Amendment (49 U. S. C. A., section 20, par. 11; U. S. Comp. St.,
section 8604a) imposes liability on the carrier of live stock for loss or
damage from delay occasioned by a strike of the carrier's employees,
unaccompanied by violence or intimidation, and prohibits exemption from
such liability by any contract, receipt, rule, regulation, or other limitation
of any character whatsoever.

*Corpus Juris-Cyc. References: Carriers, 10CJ, p. 109, n. 89; p. 164, n. 70;
p. 285, n. 6; p. 293, n. 98.

Appeal from the Circuit Court of the City of St. Louis.—Hon.
Victor H. Falkenhainer, Judge.

AFFIRMED.

*James F. Green, M. U. Hayden* and *Thos. T. Railey* for appellant.

(1) Striking employees are not acting within the scope of their
employment, for if a servant step aside from the business of his
master to do any act that is not a part of that business, the relation
of master and servant is for the time suspended, and the acts of the
servant during that interval are not his master's, but his own.  Duree

v. Ry. Co., 241 Fed. 458; Jackson v. Ry. Co., 178 Fed. 435; Russell v. Ry. Co., 155 Fed. 27; Patterson v. Kates, 152 Fed. 482; Ry. Co. v. Harvey, 144 Fed. 806; Bowen v. Ry. Co., 136 Fed. 311. (2) A contractual limitation against damage from delay occasioned by strikes is in contravention of neither the Cummins Amendment nor the common law, and is, therefore, valid with respect to interstate shipments. Warner v. Ry. Co., 274 S. W. 95; Mourer v. Ry. Co., 280 S. W. 1052; Warren v. Terminal Co., 116 Atl. 411; Fruit Distributors v. Hines, 203 Pac. 826; Ry. Co. v. Maddy, 248 S. W. 913; Ry. Co. v. Thompson, 235 S. W. 913; Produce Exchange v. Express Co., 128 Atl. 403; Ross v. Fear-Campbell Co., 147 N. E. 720; Express Co. v. Johnson, 100 So. 745; Ry. Co. v. Olvit Bros., 243 U. S. 583. (3) Even with respect to damage other than that occasioned by delay and against which the carrier was at common law an insurer, such contractual strike limitation is valid, for the Cummins Amendment forbids such limitation of liability by the carrier only with respect to damage caused "by it or its connections." Ry. Co. v. Rankin, 241 U. S. 326; Simmons Hardware Co. v. Ry. Co., 279 Fed. 933; Bragg v. Payne, 235 S. W. 148; Singer v. Express Co., 219 S. W. 662; Ry. Co. v. Zizkafoose, 135 Pac. 406.

*Frank C. Smith* for respondent.

SUTTON, C.—This is an action to recover damages for delay in an interstate shipment of three carloads of live stock. The trial, before the court without a jury, resulted in a judgment in favor of plaintiffs for $350, and defendant appeals.

The cause was tried below upon the following agreed statement of facts:

"The live stock referred to in the petition was duly delivered by the defendant to Kansas City Stock Yards, and after being fed and rested, was in due course reloaded at the Kansas City Stock Yards at 4:40 P. M., August 26, 1922, and thereafter, in due course, was switched to the Missouri Pacific and placed in Missouri Pacific outbound train scheduled to leave for St. Louis the same evening.

"On the same day and about the same hour that the stock in question was reloaded for movement into St. Louis, all conductors, engineers, trainmen and firemen in freight road service at Jefferson City, Missouri, and certain other division points on the line of the Missouri Pacific Railroad Company struck because of the fact that the Missouri Pacific Railroad Company had sanctioned the placing of United States Marshals as guards at such points during the so-called shopmen's strike then pending, which shopmen's strike began July 1, 1922. By reason of this unanticipated walk-out, occurring during the after-

noon of August 26, 1922, the Missouri Pacific Railroad Company was obliged to annul all freight train service between Kansas City and St. Louis, and accordingly ran the plaintiff's stock back to National Stock Yards at Kansas City, where it was unloaded and held until the next evening, and then moved to St. Louis on the first available train over another line.

"No claim is made that the delay was in any way negligent unless the carriers are bound by the wrongful action of their employees in striking and quitting the service, thereby occasioning the damage in question. Some claim is made for other damage which was not the proximate result of the strike, and for which the sum of $100, hereinafter referred to, has been agreed upon in settlement.

"It is further agreed that the defendant was the initial carrier within the contemplation of the Carmack Amendment with respect to through transportation, and that said shipment moved under and pursuant to live stock contracts and tariffs by virtue of which the carriers relieved themselves from liability for damage occasioned by strikes, in so far as this could legally be done, and the only question at issue concerns the validity of this limitation of liability for damage occasioned by strikes, which issue shall be submitted to the court without a jury. It is the contention of plaintiff that any purported limitation of liability from damage occasioned by striking employees is in contravention of the common law and the Cummins Amendment to the Interstate Commerce Act, and therefore, void.

"The question left open for the court is as to whether or not the carrier is liable for damages occasioned by delay, when such delay is the result of a strike of its employees.

"Counsel for the carrier relies upon the strike exempting clause in its bill of lading.

"Counsel for plaintiff contends that under the common law and Cummins Amendment, any such strike exempting clause is a nullity.

"Hence, if the court should find that the strike exempting clause is binding on the shipper, plaintiff is to have a judgment for $100 to cover damage in transit other than that which was the direct and proximate result of said strike. Should the court find that such strike exempting clause is not binding on the shipper, then such judgment shall be for $350."

The defendant complains here that under the agreed statement of facts and the law applicable thereto the judgment given for plaintiffs should have been for the sum of $100, and no more.

The original Interstate Commerce Act was enacted in 1887. [24 U. S. Statutes at Large 379.] The act was amended in 1906. [34 U. S. Statutes at Large 584 and 595.]

Section 7 of this amendment, which is generally referred to as the Carmack Amendment, provided:

"That any common carrier, railroad, or transportation company receiving property for transportation from a point in one State to a point in another State shall issue a receipt or bill of lading therefor and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass, and no contract, receipt, rule, or regulation shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed; *Provided*, That nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under existing law."

The First Cummins Amendment (38 U. S. Statutes at Large 1197, sec. 1) enacted in 1915, provides as follows:

"That any common carrier, railroad, or transportation company subject to the provisions of this Act receiving property for transportation from a point in one State or Territory or the District of Columbia to a point in another State, Territory, District of Columbia, or from any point in the United States to a point in an adjacent foreign country shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass within the United States or within an adjacent foreign country when transported on a through bill of lading, and no contract, receipt, rule, regulation, or other limitation of any character whatsoever, shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed; and any such common carrier, railroad, or transportation company so receiving property for transportation from a point in one State, Territory, or the District of Columbia to a point in another State or Territory, or from a point in a State or Territory to a point in the District of Columbia, or from any point in the United States to a point in an adjacent foreign country, or for transportation wholly within a Territory shall be liable to the lawful holder of said receipt or bill of lading or to any party entitled to recover thereon, whether such receipt or bill of lading has been issued or not, for the full actual loss, damage, or injury to such property caused by it or by any such common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass within the United States or within an adjacent foreign country when transported on a through bill of lading, notwithstanding any limitation of liability or limitation of the amount of recovery or representation or agreement as to value in any such

receipt or bill of lading, or in any contract, rule, regulation, or in any tariff filed with the Interstate Commerce Commission; and any such limitation, without respect to the manner or form in which it is sought to be made is hereby declared to be unlawful and void.''

The Second Cummins Amendment (39 U. S. Statutes at Large, 442), enacted in 1916, amended the First Cummins Amendment by adding to section 1 thereof the following proviso:

''Provided, however, that the provisions hereof respecting liability for full actual loss, damage, or injury, notwithstanding any limitation of liability or recovery or representation or agreement or release as to value, and declaring any such limitation to be unlawful and void, shall not apply, first, to baggage carried on passenger trains or boats, or trains or boats carrying passengers; second, to property, except ordinary live stock, received for transportation concerning which the carrier shall have been or shall hereafter be expressly authorized or required by order of the Interstate Commerce Commission to establish and maintain rates dependent upon the value declared in writing by the shipper or agreed upon in writing as the released value of the property, in which case such declaration or agreement shall have no other effect than to limit liability and recovery to an amount not exceeding the value so declared or released, and shall not, so far as relates to values, be held to be a violation of section ten of this Act to regulate commerce, as amended; . . . The term 'ordinary live stock' shall include all cattle, swine, sheep, goats, horses, and mules, except such as are chiefly valuable for breeding, racing, show purposes, or other special uses.''

The Second Cummins Amendment obviously has no application to the shipment involved in this case, for shipments of ordinary live stock are expressly excepted from its provisions.

In 1912, the Supreme Court of the United States, in Adams Express Co. v. Croninger, 226 U. S. 491, having under review the Carmack Amendment ruled that it was competent for the carrier by a fair, open, and reasonable agreement to limit the amount recoverable by the shipper to an agreed value made for the purpose of obtaining the lower of two or more rates proportioned to the amount of the risk, and that the provisions of the Carmack Amendment were not violated by such an agreement. It was ruled that such a contract was not an exemption from liability for negligence in the management of the property intrusted to the carrier, within the meaning of the Carmack Amendment, but that the purpose of the contract was to describe and define the subject-matter of the contract for the purpose of showing of what value that is which comes into the carrier's possession and for which the carrier must account in the performance of its duty as a carrier, and that the

provisions of the Carmack Amendment forbidding exemptions from liability imposed by the amendment were not violated by such a contract. This ruling of the Supreme Court was doubtless responsible for the enactment of the First Cummins Amendment, which not only forbids exemption from the liability imposed thereby, but also forbids any limitation of the amount of the recovery, and makes the carrier liable for the full actual loss, damage, or injury, notwithstanding any limitation of liability or limitation of the amount of recovery or representation or agreement as to value.

Notwithstanding the only question for decision as submitted under the agreed statement of facts in the present case relates to the binding effect *vel non* of the exemption clause of the shipment contract, defendant now takes the position that the liability imposed by the statute is merely the liability imposed at common law, and that at common law the carrier is not liable for loss or damage arising from delay in the shipment of freight unless the delay resulted from some negligence of the carrier, and that since the delay in this case was caused by a strike of defendant's employees the defendant is not chargeable with negligence in the premises and is not liable for the delay though there were no exemption clause in the shipment contract.

At common law a common carrier receiving freight for transportation contracts to transport the same to destination safely and becomes an insurer against loss or damage resulting from any cause other than the act of God, the public enemy, or the inherent vice or nature of the freight. So, too, the law implies a contract that the freight should be delivered at destination within a reasonable time, and this duty it is said is as obligatory as the duty to deliver safely. [Dawson v. Chicago & Alton R. Co., 79 Mo. 296, l. c. 300; Pruitt v. Hannibal & St. Joseph R. Co., 62 Mo. 527, l. c. 539; Faulkner v. South Pacific R. Co., 51 Mo. 311; Sullivan v. American Railway Express Co., 211 Mo. App. 123, 245 S. W. 375; Tucker v. Pacific R. Co., 50 Mo. 385, l. c. 386; Read v. St. Louis Kansas City & Northern R. Co., 60 Mo. 199; 10 Corpus Juris 285, and numerous cases there cited.]

The rule invoked by defendant that the carrier is not an insurer against delay and is bound to use only reasonable diligence in performing its contract to deliver within a reasonable time, and that only negligence will render it liable for loss or damage arising on account of delay, has rarely, if ever, been applied, so far as we are advised, to defeat recovery for delay caused by a strike of the carrier's employees, where, as in this case, trainmen charged with the immediate duty of continuing the movement of a train carrying freight already in transit, suddenly abandoned the service of the carrier and refused to move the train, and no violence or intimidation was employed to obstruct the movement of the train. On the

contrary, the courts have generally held the carrier liable for delay resulting from the sudden abandonment of the service or refusal to work by its employees unaccompanied by violence or intimidation.

In Read v. St. Louis, Kansas City & Northern R. Co., 60 Mo. 199, our own Supreme Court said:

"We think the court declared the law correctly in requiring that, in order to amount to an excuse for the delay, the obstructions to the running of the trains should have been the work of persons other than the employees or servants of the road.

"A company will be held responsible for damages resulting from a delay to transport freight in the usual time, when it is caused by its servants suddenly and wrongfully refusing to work. Because the employees refuse to work or perform their usual employment, it will not release the company or the carrier from the responsibility of his contract. It may be his misfortune, but third persons are not to suffer thereby. His liability is all the same whether he could get others to supply their places or not.

"If a contractor should enter into an agreement to build a house, and have it completed at a certain stipulated time, and his workmen should leave him, so that he could not finish it at the time, surely this would not release him from liability in not fulfilling his contract."

In Jonesboro, Lake City & Eastern Railroad Co. v. Maddy (Ark.), 248 S. W. 911, which was an action for damages resulting from delay in the shipment of a carload of hogs from a point in Arkansas to National Stock Yards, Illinois, the court said:

"There is no evidence in the record tending to show that the negligence of the railroad company in failing to deliver the hogs was due to any violence on the part of the strikers on the terminal carrier or any connecting carrier. Hence it is not necessary to decide whether or not violence on the part of the strikers would excuse the railroad company. It is sufficient to say that the general rule is that the carrier is liable for the negligence of its servants during the course of their employment, and therefore if its employees go on a strike, abandoning the performance of their duty and causing the delay in the transportation of goods, the carrier is liable."

In Buschow Lumber Co. v. Union Pacific R. Co. (Mo. App.), 276 S. W. 409, the court quotes with approval, as the general rule, the following from 10 C. J. 293:

"The carrier is liable for the negligent or wrongful acts of its servants during the course of their employment, and therefore, if its employees go on a strike, abandoning the performance of their duties and causing delay in the transportation of goods in their charge or control, the carrier is liable, the delay being due to the employees' wrongful acts."

In Pittsburgh, Cincinnati & St. Louis Ry. Co. v. Hollowell, 65 Ind. 188, which was an action for delay in carrying live stock, it was said to be a well-settled principle of law that a delay caused by a strike of the employees of the carrier does not excuse the carrier from carrying freight according to its contract or public duty, citing in support, Redfield on Carriers, sec. 28; Edwards on Bailments, sec. 609; Conger v. The Hudson River R. R. Co., 6 Duer. 375; Parsons v. Hardy, 14 Wend. 215; Blackstock v. The New York & Erie R. R. Co., 20 N. Y. 48, and Condict v. The Grand Trunk R. W. Co., 54 N. Y. 500.

In Rittman v. Missouri Pacific R. Co., 184 Mo. App. 424, 171 S. W. 8, which was an action for delay in the shipment of live stock, it was held that evidence that the reason that the carrier did not perform its duty in carrying the live stock was that the crew in charge of the train carrying the live stock abandoned the train on account of the cold weather, showed no legal excuse for the delay.

In Missouri, Kansas & Texas Ry. Co. v. Woods (Tex. Civ. App.), 117 S. W. 196, which was an action for delay in a shipment of live stock from Durant, Indian Territory, to Shawnee, Oklahoma Territory, the shipment was delayed at Phillips, and damage resulted. It appeared that the engineer sent by the carrier from Shawnee to Phillips to operate the engine attached to the train carrying the live stock, from that point to Shawnee, claimed rest and refused to take charge of the engine and continue the movement of the train. It was held that the act of the engineer in refusing to take charge of the engine and move the train was the act of the carrier, and that the carrier could not escape liability for the delay occasioned by such refusal, although the carrier used ordinary care to procure another engineer to move the train.

In Pittsburgh, Ft. Wayne & Chicago R. Co. v. Hazen, 84 Ill. 36. the court said:

"For the delay resulting from the refusal of the employees of the company to do duty, the company is undoubtedly responsible. For delay resulting solely from the lawless violence of men not in the employment of the company, the company is not responsible, even though the men whose violence caused the delay had, but a short time before, been employed by the company.

"Where employees suddenly refuse to work, and are discharged, and delay results from the failure of the carrier to supply promptly their places, such delay is attributable to the misconduct of the employees in refusing to do their duty, and this misconduct in such case is justly considered the proximate cause of the delay; but when the places of the recusant employees are promptly supplied by other competent men, and the 'strikers' then prevent the new employees from doing duty by lawless and irresistible violence, the delay re-

sulting solely from this cause is not attributable to the misconduct of employees, but arises from the misconduct of persons for whose acts the carrier is in no manner responsible."

In 1 Moore on Carriers (2 Ed.), at page 124, it is said that "refusal or failure of a railroad company to perform its duties as a common carrier cannot be excused for the reason that a strike on one road will be extended to the other, if it hauls the cars, nor by the fact that its skilled freight-handlers have refused to work for the wages theretofore paid, when no unlawful violence on their part is shown."

In Blackstock v. New York & Erie R. Co., 1 Bosw. 77, 20 N. Y. 48, the court held that the fidelity of the servants of a carrier is at the risk of the carrier, and that it is no answer to a suit for failure to deliver freight with reasonable promptness that a strike among the carrier's employees prevented. In argument the court in that case said:

"The liability of the master for a neglect of duty by the servant exists independently of the question whether there is any fault in the master himself. True, the master is sometimes held liable for the employment of an improper or unskillful servant, but he is often liable when no blame attaches to himself personally. And, for the same reason, he may not excuse himself for a failure to perform a duty which he owes to third persons, by showing that his servant, who was charged with its performance, neglected or refused to do it. The master, assuming to perform the duty, assumes also the hazard of the competency and fidelity of the servants whom he employs.

"The same rule must be applied to corporations. Their operations are, necessarily, conducted by the instrumentality of agents, and to say that the want of fidelity on the part of their servants excuses them from the performance of any duty which they owe to third persons would be, practically, to exempt them from liability for any negligence, or any misfeasance, which was not the immediate or necessary consequence of a corporate act.

"The present case is, undoubtedly, one of some hardship. It cannot, for a moment, be claimed that a combination, resulting in a refusal to work by one hundred and forty out of one hundred and sixty-eight men of skill, whose services were indispensable to the conduct of the defendants' business, ought to have been foreseen, when there was no just cause for such a refusal: And it was probably impossible, by any ordinary means, to have supplied their places on the day on which their refusal took effect; indeed, on so short a notice as the defendants received, it may be regarded as quite impossible. Nevertheless we must regard the hazard of such an occurrence as resting upon the employers. . . . Practically, the defendants in such circumstances may suffer, by the misconduct of their servants, without redress, but the *law* imposes no such hardship, on the con-

trary, it will hold the unfaithful servant liable for the direct and immediate consequences of his own fault, and this will, so far as the law can do so, give to the master indemnity.

"It ought not to be doubted, and probably would not be doubted, that if, by the negligence of a single engineer in charge of a train, or by his perverse refusal to perform his duty, his train was unnecessarily delayed, the Company would be liable for the delay. When the delay is said to be excused if it happen without their 'fault,' the term is not used as imputing personal blame, but it means without fault on their part, in their servants or otherwise.

"If this be so, it is difficult to perceive how, in principle, the rule of liability is affected by increasing the number of servants who are guilty.

"An individual carrier may be so conducting his business, that it is only necessary for him to employ one servant to drive one of his wagons; suppose that servant, when at a distance on his journey, abandons the wagon, and days elapse before the carrier hears of its non-arrival, or learns the cause; in such case, assuming that there was no want of care or judgment in selecting his servant, the delay was as to the master personally, without his fault, and in a sense unavoidable, and yet he cannot be held excused. The fidelity of the servant was at his risk—the fault of his servant is, in a legal sense his fault.

"We cannot think the rule would be otherwise if his business require him to employ a hundred servants, and they all prove unfaithful. Such a case is, of course, extraordinary, and may create a hardship, but we do not perceive that any new rule is to be prescribed for that reason. If it may be, what number of servants must combine to call for its application? No answer to this question suggests itself to our minds."

The text of 4 Ruling Case Law, page 743, states the rule as follows:

"As has been already stated, a failure on the part of a carrier ultimately to deliver in safety goods intrusted to it for carriage, owing to the violence or depredations of a mob, is not excused, since such acts do not come within the legal comprehension of the terms 'act of God, or "the public enemy.' This circumstance and the application of the maxim, *respondeat superior*, have probably induced some courts in a few of the earlier decisions to hold that a carrier is liable for the inevitable delay and consequent damage to goods in transit caused by strikes of employees, armed mobs, or rioters. On the other hand, later authorities, recognizing that in the absence of special contract there is no absolute duty resting on a railroad carrier to deliver goods intrusted to it within what, under ordinary circumstances, would be a reasonable time, maintain the now generally approved doctrine that not only storms and floods and other

natural causes may excuse delay, but the conduct of men may also do so. Thus, an incendiary may burn down a bridge, or a mob may tear up the tracks or disable the rolling stock or interpose irresistible force or overpowering intimidation, and in such a case, if the carrier, not otherwise in fault, uses reasonable efforts and due diligence to overcome the obstacles thus interposed, and to forward the goods to their destination, it will be relieved of responsibility. So a common carrier is not liable for loss or damage naturally resulting from delay in delivering freight, caused by a strike of employees, if accompanied by intimidation and violence. In such a case the fact that the striking workmen whose violence causes delay have but a short time before been employed by the carrier is of no moment, since when such men abandon the carrier's employment, they cease to be his servants or agents for whose acts he is responsible; and even though a strike is organized while the men are in the carrier's employ, it is a matter outside their employment, and excuses the carrier from liability. But while for a delay resulting solely from the lawless violence of former employees who have struck and quit their employment a carrier is not responsible, it seems that where the employees of a company suddenly abandon its service, and, while offering no violence, and causing no forcible obstruction to its business, simply refuse to work or to further discharge their duties, for any delay consequent thereon as, for instance, where there is a failure to supply promptly their places, the carrier is liable.''

In Greismer v. Lake Shore & M. S. R. Co. (N. Y.), 7 N. E. 828, where freight was delayed on account of the violence and intimidation by striking employees, the court said:

''It is true that these men had been in the employment of the defendant. But they left and abandoned that employment. They ceased to be in its service, or in any sense its agents for whose conduct it was responsible. They not only refused to obey its orders or to render it any service, but they willfully arrayed themselves in positive hostility against it, and intimidated and defeated the efforts of employees who were willing to serve it. They became a mob of vicious law-breakers, to be dealt with by the government, whose duty it was, by the use of adequate force, to restore order, enforce proper respect for private property and private rights, and obedience to law. . . .

''It matters not if it be true that the strike was conceived and organized while the strikers were in the employment of the defendant. In doing that, they were not in its service, or seeking to promote its interests, or to discharge any duty they owed it, but they were engaged in a matter entirely outside of their employment, and seeking their own end, and not the interests of the defendant.

The mischief did not come from the strike—from the refusal of the employees to work—but from their violent and unlawful conduct after they had abandoned the service of the defendant.

"Here, upon the facts which we must assume to be true, there was no default on the part of the defendant. It had employees who were ready and willing to manage its train, and carry forward the stock, and thus perform its contract and discharge its duty; but they were prevented by mob violence, which the defendant could not by reasonable efforts overcome. That under such circumstances the delay was excused, has been held in several cases quite analogous to this, which are entitled to much respect as authorities. [Pittsburgh, etc., R. Co. v. Hazen, 84 Ill. 36; Pittsburgh, C. & St. L. Ry. Co. v. Hollowell, 65 Ind. 188; Lake Shore & M. S. R. Co. v. Bennett, 89 Ind. 457; S. C. 6 Amer. & Eng. R. Cas. 391; Indianapolis & St. L. R. Co. v. Juntgen, 10 Bradw. 295.]

"The cases of Weed v. Panama R. Co., 17 N. Y. 362, and Blackstock v. New York & E. R. Co., 1 Bosw. 77, S. C. affirmed, 20 N. Y. 48, do not sustain the plaintiff's contention here. If, in this case, the employees of the defendant had simply refused to discharge their duties or to work, or had suddenly abandoned its service, offering no violence, and causing no forcible obstruction to its business, those authorities could have been cited for the maintenance of an action upon principles stated in the opinions in those cases."

There ought to be no question as to the liability of the carrier for loss or damage resulting from delay occasioned by the sudden abandonment of the service of the carrier by its employees, either at common law or under the statute. If the strikers, after having abandoned the service of the carrier, proceed by lawless violence to obstruct the movement of trains, a different case is presented. But that the shipper of freight accepted by the carrier for transportation should be required to bear the loss or damage resulting from a sudden strike, the outgrowth of contentions between the carrier and its employees, which goes no further than the peaceable withdrawal of the employees from the service of the carrier, does not appeal to a right sense of justice. It is the duty of the carrier accepting freight for shipment to transport the same with reasonable dispatch. And it has been held from the earliest times, upon the soundest principles of justice, that the carrier is not excused from the performance of this duty by the mere refusal of its servants to perform their work, unaccompanied by violence or intimidation. It has been expressly so held by our own Supreme Court, and by many other courts, whose opinions are entitled to the greatest respect, and no Federal decisions have been brought to our attention holding the contrary.

We are satisfied that the statute imposes liability on the carrier of live stock for loss or damage from delay occasioned by a strike of the carrier's employees, under circumstances such as appear in this case, and prohibits exemption from such liability by any contract, receipt, rule, regulation, or other limitation of any character whatsoever. [Adams Express Co. v. Darden, 265 U. S. 265.]

The defendant in support of its position places much reliance upon the following cases: Pennsylvania R. Co. v. Olivit Bros., 243 U. S. 574, Simmons Hardware Co. v. Southern Ry. Co., 279 Fed. 929, Warner v. St. Louis-San Francisco Ry. Co. (Mo. App.), 274 S. W. 90, Mourer v. Wabash Ry. Co. (Mo. App.), 280 S. W. 1050.

We regard those cases as clearly distinguishable from the case at bar.

Pennsylvania Railroad Co. v. Olivit Brothers was a suit for loss or damage resulting from delay in the transportation and delivery of an interstate shipment of watermelons. It was shown that the delay was caused by a strike accompanied by demonstrations of violence over which the carrier had no control and against which it could not contend. The shipment was made long after the striking employees had abandoned the service of the carrier. The bill of lading contained an agreement exempting the carrier from liability for loss or damage resulting from delay, if the delay was caused by a strike or strikes among the carrier's employees, but the validity of this agreement or the power of the carrier to exempt itself from liability by such an agreement was a question never raised or decided in the case. The shipper had judgment in the court below, and the carrier appealed. Upon the appeal the carrier insisted that having shown the delay was caused by a strike of its employees, the burden was then upon the shipper to show negligence on the part of the carrier to entitle the shipper to recover, and that the court below had erred in failing to so declare the law. Whereupon the Supreme Court held that the court below had so declared the law, and the judgment was affirmed. The Supreme Court did not say that the court below had correctly declared the law, but merely said that the court below had declared the law just as the appealing carrier claimed it should have been declared.

Simmons Hardware Co. v. Southern Railway Co. was an action to recover the value of an interstate shipment of goods which were destroyed by fire. The bill of lading contained a provision exempting the carrier from liability for loss or damage resulting from riots or strikes. It was stipulated that the loss or damage sued for was caused by rioters then engaged in a riot for which the carrier was in no way responsible. It does not appear that the rioters were then or ever had been in the employ of the carrier.

Warner v. St. Louis & San Francisco Railway Company was an action for loss or damage resulting from delay in an interstate shipment of live stock. The delay was caused by a strike of the carrier's employees. The shipment was made under a written agreement exempting the carrier from liability for delay on account of strikes. It appeared, however, that the strike was nation-wide, and that at the time the shipment was made the strike had been in existence nearly five months, and the court in discussion said that it would be unreasonable to hold that men out of the carrier's employment for such a great length of time and on such a great scale continued to be the carrier's servants, and the court further said that the exemption contract was made in consideration of the unusual condition then existing.

Mourer v. Wabash Railway Company was an action for loss or damage resulting from the delay of an interstate shipment of live stock. The shipment was made under an agreement exempting the carrier from liability for loss or damage caused by strikes. The delay in the shipment was caused by the lawless violence and sabotage of strikers who had abandoned the service of the carrier long prior to the time the shipment was made.

The distinction between these cases and the case at bar is obvious.

The Commissioner recommends that the judgment of the circuit court be affirmed.

PER CURIAM:—The foregoing opinion of Sutton, C., is adopted as the opinion of the court. The judgment of the circuit court is accordingly affirmed. *Daues, P. J.,* and *Becker* and *Nipper, JJ.,* concur.