---

## THE NO. C-4.

(District Court, S. D. New York. December 31, 1923.)

1. Collision ⬟73—Burden of proof resting on vessel for collision with anchored vessels.

The owner of a vessel, which came into collision with others anchored where they had a right to be, to avoid liability, has the burden to show what was the cause of the accident, and that the result of that was unavoidable, or he must show all of the possible causes, one or other of which produced the effect, and must further show with regard to every one of these possible causes that the result could not have been avoided.

2. Master and servant ⬟302(2)—Owner not liable for collision by boat cast adrift by employee without authority.

The owner of a moored vessel, which is cast adrift by an employee without its authority, is not liable for a resulting collision.

3. Master and servant ⬟301(1)—Employee going on strike ceases to be employee.

An employee who goes on strike immediately ceases to be an employee, and the former employer is not liable for the result of his acts.

⬟For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**4. Collision ☞70—Not negligence to leave moored vessels in New York Harbor without watchmen.**

There being no custom to keep watchmen on boats lying in slips in New York Harbor, it was not negligence for the owner of a car float to leave it moored to a pier without a watchman, though some of its employees had gone out on a strike, where there had been no violence, and there was no reason to apprehend interference with the boat.

**5. Collision ☞70—Owner of moored boat cast adrift by unknown persons held not liable for resulting collision.**

The owner of a car float lift securely moored to a pier, but which, as shown by the evidence, was intentionally cast adrift without its authority or knowledge, *held* not liable for collision between the float and anchored vessels.

In Admiralty. Suits by the Cornell Steamboat Company and by the New York, Ontario & Western Railway Company against the New York Central car float C–4; New York Central Railroad Company, claimant. Decrees for respondent.

Decree affirmed, 300 Fed. 761.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (Robert S. Erskine, of New York City, of counsel), for libelant Cornell Steamboat Co.

Alexander & Ash, of New York City (Peter Alexander, of New York City, of counsel), for libelant New York, O. & W. Ry. Co.

Bigham, Englar & Jones, of New York City (L. J. Matteson, of New York City, of counsel), for claimant.

GODDARD, District Judge. In these suits the libelants seek to recover damages for injuries sustained as a result of the claimant's car float C–4 having collided with a stakeboat and a barge while they were at anchor in the North River. On the night of April 7, 1920, the stakeboat Clifton, owned by the Cornell Steamboat Company, was anchored in the North River. Just below the Clifton, the New York, Ontario & Western Railway Company's barge Metacomet, having on board a cargo of 1,350 tons of coal consigned to Boston, was lying at anchor on the anchorage ground.

The New York Central car float C–4, loaded with box cars, was lying moored across the river end of Pier 4 of its West Shore Terminal, located at Weehawken, N. J., headed upstream, with its port side to the dock. The car float was about 250 feet long, and was provided with mooring posts along each side, spaced 30 feet apart, except the end posts, which were 20 feet from the bow and stern, respectively. The width of the pier was approximately 195 feet, so that the ends of the C–4 projected beyond the sides of the pier between 27 and 28 feet. She was made fast by two 4½-inch lines in the following manner:

The eye of the line was placed on the second bitt from the bow on the port side of the float; then the bight of the line was passed around the mooring post on the upper corner of the pier and brought back to the vessel, where it was made fast with half hitches over the eye on the same post. The stern line on the port side was made fast to the mooring post on the lower corner of the pier in the same manner. The

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

second mooring post from the bow was about 10 or 12 feet below the upper side of the pier, and as she was laying in her berth she was below the level of the dock. This gave the line a lead of 12 to 14 feet.

At about 5 a. m. on April 8th the C-4 parted her moorings and went adrift; the wind at the time was northwest strong, and the tide strong ebb. Impelled by the force of the tide and wind, she came down the river, struck the Clifton, and, continuing down stream, struck the Metacomet, injurying both. There was no one aboard the C-4 and after the captain of the Metacomet had ascertained that she was not injured below the water line he went ashore and located the C-4, which had fetched up in the slip at Pier 47. There was no one on board C-4 when she went adrift.

[1] The Clifton and the Metacomet were at anchor, where they had the right to be, so that they are free from any blame. The claimant, in order to clear float C-4 from liability, "must either show what was the cause of the accident, and show that the result of that cause was inevitable, or they must show all the possible causes, one or other of which produced the effect, and must further show with regard to every one of these possible causes that the result could not have been avoided." The Edmund Moran (C. C. A. 2d Circuit, 1910) 180 Fed. 700, 104 C. C. A. 552.

If the float C-4 went adrift through the parting or working loose of her lines because of the fact of the wind or tide, such a result could not be claimed to be inevitable, for the tide and wind conditions were not at all exceptional. But it is quite apparent from the evidence that it was neither wind nor tide which did cause her to go adrift. She was moored in a customary fashion, and sufficient slack was left in the lines to provide for the rise and fall of the tide. When the float was caught after being adrift, the forward line was found in two parts, both made fast over the bitt on the float. The line was not stranded, as if parted from a strain, or the ends frayed by wearing, but showed a clean cut across all strands, indicating that it had been cut by a sharp instrument, like an ax. The aft line was still made fast as originally on the bitt, and the bight must have been lifted by some human agency over the 5-foot mooring post on the pier.

The conclusion from these facts is inevitable that the float C-4 was set adrift intentionally by some person or persons. So the question presented in this case is whether the claimant is liable where its float is so cast adrift. The answer to this depends upon who did it and under what circumstances. Those persons who might have done it may be divided into four classes: (1) An employee of the claimant with authority to handle the lines of the float. (2) An employee of the claimant without authority to handle the lines of the float. (3) A former employee of the claimant, who was out on strike at the time; that is, a striker. (4) A stranger.

[2] From the testimony it is clear that the act was not done by any employee with authority to handle the lines of the float; this eliminates liability No. 1. If the float was set adrift by an employee of the claimant, who had no authority to touch the lines of the float, the claimant is not responsible. The Dunham Wheeler, 300 Fed. 731, opinion of Judge Learned Hand, June 20, 1923, not officially reported;

this decision being based on the principles of liability of a principal for the acts of his agent, the principal not being liable for the acts of an employee outside of the scope of his authority. 31 Cyc. 1584. This eliminates liability under No. 2.

[3] If the C–4 was cast adrift by a striker with malicious intent, the claimant is not responsible. An employee going on a strike immediately ceases to be an employee. In this case the marine strike began a week before this, so that the connection of the strikers with the company had been terminated for about a week; that strikers ipso facto ceased to be employees or agents of their former employer is the rule adopted by this circuit in Richland Queen, 254 Fed. 668, at page 670, 166 C. C. A. 166, and by the New York Court of Appeals in Geismer v. Lake Shore, etc., Railway Company, 102 N. Y. 563, 570, 571, 7 N. E. 828, 55 Am. Rep. 837.

[4, 5] There is really no ground for considering strikers on any basis different from the persons included in class 4—that is, malicious strangers—unless the existence of a strike required the claimants to maintain a special guard to prevent malicious acts on the part of the strikers. It cannot be said that there was an anticipated danger that a malicious striker would cut the lines and cast the boat adrift. The strike had been in effect about one week, and apparently there had been no violence by strikers, nor was there anything to indicate that there would be. Under such circumstances, it does not seem to me that the railroad company was called upon to station a guard upon the boat. There are authorities holding to the effect that if the railroad company had knowledge of a special danger, or that there was cause for it to anticipate violence, it should act accordingly. But in this case I see no reason why it was bound to anticipate and prevent a criminal act on the part of another. The testimony is that it was not customary to have watchmen watch floats for any other reason than to keep thieves from stealing freight from cars which had valuable freight in them. The Circuit Court of Appeals for this circuit, in an opinion by Ward. C. J., stated in The Kathryn B. Guinan, 176 Fed. 301, 99 C. C. A. 639:

"It is not negligence to leave a scow in a slip in New York Harbor, tied up to a pier, without a watchman; there being no custom to keep one in such case. * * * There is no evidence of any custom to keep watchmen on boats lying in the slips of New York harbor, and such a burden would be very onerous."

Accordingly a decree may be entered in favor of the claimant, dismissing the libel, without costs.