## THE EAST INDIAN.
## THE EUREKA.

### HIRSCH LUMBER CO. v. FORD MOTOR CO. et al.

### FORD MOTOR CO. v. HARBOR CONTRACTING CO., Inc.

### SAME v. NEW YORK & ALBANY LIGHTERAGE CO.

### NEW YORK & ALBANY LIGHTERAGE CO. v. HARBOR CONTRACTING CO., Inc.

District Court, S. D. New York.
March 29, 1932.

Harry D. Thirkield, of New York City, for Hirsch Lumber Co.

Burlingham, Veeder, Masten & Fearey, of New York City (Eugene Underwood, of New York City, of counsel), for Ford Motor Co.

Dusenbury & Voss, of New York City, for Harbor Contracting Co.

Macklin, Brown, Lenahan & Speer, of New York City (J. D. Eggleston and C. F. Vander Clute, both of New York City, of counsel), for New York & Albany Lighterage Co.

KNOX, District Judge.

On or about October 19, 1927, Hirsch Lumber Company loaded 1,236,691 feet of lumber on board the steamer East Indian, owned by Ford Motor Company, and then lying at Seattle, Wash., for transportation to New York. Hirsch Lumber Company entered into an agreement with New York & Albany Lighterage Company, owner of the barge Eureka, to receive a portion of the lumber from the East Indian, and to carry the same from the ship's side to the plant of Church E. Gates & Co. at Oak Point, N. Y. The Ford Motor Company engaged the Harbor Contracting Company, Inc., as stevedore to transfer the lumber from the East Indian to the Eureka, which, it is alleged, had been delivered into the custody of the steamship East Indian and of Harbor Contracting Company, Inc., for the purpose of receiving the said load of lumber.

The East Indian reached this port about November 11, 1927, and tied up at one of the Kerr Line Piers in Brooklyn. She lay bow in, well up the pier, and about 50 feet from the street bulkhead. The Eureka went along the steamer's starboard side to receive the cargo she was to carry. All went well, and the lighter was fully loaded about 4 o'clock, p. m. on November 15. The lighter bow out, was made fast to the steamer between hatches 3 and 4 by four lines. These consisted of a breast line, two spring lines, running from the stern of the lighter which lay toward the bow of the ship, to the steamer, and a spring line which ran from the lighter's stern to the ship. Thus positioned, the Eureka rode safely through the night. At 7 o'clock on the morning of November 16, the workmen of Harbor Contracting Company, Inc., returned aboard the East Indian for the purpose of finishing the discharge of the East Indian. For this purpose they made use of another lighter, moored alongside the East Indian, and began to work on hatches 2 and 3. Meanwhile the bargeman of the Eureka had gone to breakfast, leaving the boat unattended. During his absence, but at a time that is not definitely ascertainable, the stern lines of the Eureka were thrown off the ship, permitting the lighter to swing around under the overhang of the East Indian, and to fetch up on a blade of her starboard propeller, with consequent injuries to the Eureka and the propeller of the East Indian.

In order to float the barge, the East Indian, if the story of the chief engineer is to be credited, gently turned his propeller under power of the jacking engine. Other witnesses, both fact and expert, gave testimony to the effect that the power was furnished by the main engine, and that this was applied with such violence as to tear holes in the bottom and side of the barge. Whatever may be the truth as to the force of the propulsion used in freeing the barge, there is no dispute but that the Eureka shortly turned over, dumping most of her cargo.

For the damages thus sustained, Hirsch Lumber Company, owner of the lost and soiled cargo, filed a libel against the East Indian, Ford Motor Company (owner of the steamer), the Eureka, and her owners, New York & Albany Lighterage Company. The last-mentioned concern had agreed with the libelant to receive the lumber from off the

East Indian, and to transport the same to destination. The respondents in the original libel, each claiming that the stevedores who discharged the steamer are responsible for the accident, impleaded the concern by which they were employed, viz., Harbor Contracting Company, Inc.

Ford Motor Company also filed a cross-libel against the Eureka, her owners, and Harbor Contracting Company, to recover for damage done the propeller, and the New York & Albany Lighterage Company retaliated with a libel against both the East Indian and the stevedoring concern, asking for the cost of repairing the Eureka. Each party denies its own liability, and endeavors to place the blame on one or more of the others. In this connection, attention should be directed to the fact that Harbor Contracting Company, Inc., is now out of business, and, so far as can be ascertained, is entirely without assets. Its proctors, therefore, with the acquiescence of the parties in interest, asked to be relieved from participation in the trial, and received permission to retire.

With the parties thus positioned, the issues between them have been presented to the court, and must now be decided. A solution is not easy, in that the evidence is most unsatisfactory. Its sum total is that no person saw the stern lines of the Eureka thrown off the ship, and no one, with much certainty, can say whether the barge was damaged by the turning of the propeller, or merely by contact with it. The officers of the ship, on board at the time of the accident, declare that the propeller was not turned over by the main engine of the East Indian until 6 o'clock in the evening following the accident. As against this proof, the captain of the Eureka, and the master of the tug James Watt, which was in the slip, declare the ship's engines to have been run several times during the day, and to have scattered the dumped lumber. As bearing upon the conflicts in this behalf, mention may be made that the marine superintendent of Ford Motor Company says the East Indian's starboard propeller was tested at about 3 o'clock p. m., while Mr. Spencer, a surveyor of the American Bureau of Shipping, declares the propeller to have turned at half speed for a period of five minutes beginning at 11:15 a. m. The experts called as witnesses have given but little assistance in the way of a determination of what actually occurred. For example, Swinburne stated his opinion to be that the injury was occasioned merely by the contact of the lighter with the propeller, and without the latter having been in motion. Martin testified to the same effect. On the other hand, Mr. Haight says the damage could not have been thus caused, and that it arose through the motion of the propeller as it was turned over by the jacking engine. Helprin, a surveyor, called by Hirsch Lumber Company, thought that the injury to the barge could have been caused only if the propeller was turned by the main engine, while Swenson believed that the bottom damage came about from a movement of the blade at half speed, and that the side wounds were occasioned by a reversal of the propeller.

The matter of fixing responsibility for throwing off the lines of the Eureka is hardly more clear. Both the foreman of the stevedoring corporation, and its hatch boss, declare positively that none of them did so, and, furthermore, that there was no occasion to shift the Eureka prior to the time she was cast adrift. So far as the steamer is concerned, none of its officers or crew admits seeing any disturbance of the lines of the barge. This point of the case, if it is to be decided at all, must be determined by the probabilities, and, as to these, I think they weigh more heavily against the stevedores. By this is meant that, early on the morning of the accident, the stevedores began to discharge lumber from hatches 2 and 3 to a lighter which seems to have laid forward of the stern of the Eureka. The ship's log indicates that at 7 a. m. three gangs of stevedores came aboard and started to work on Nos. 1, 2, and 3 holds, and shifted about to the deep tank and to No. 4 hold. Cardillo, in part at least, confirms this entry, although he contends that he had no need to shift the lighter which received lumber on the morning of November 16, until after the Eureka had careened. Whatever may be the fact in this regard, it seems very likely that some of the stevedores, realizing that the Eureka would have to be shifted, undertook to get her out of the way, and let go her lines; and, in failing to care for them properly, made it possible for the craft to swing around onto the propeller. So far as is shown, there was no special reason why the officers or crew of the East Indian should touch the lines, and, in the absence of an occasion for the ship to move the barge, I think it improbable that any of its complement would greatly concern himself with her. As employees of the Harbor Contracting Company were the only other persons on board the steamer, it would seem to follow that the fault of allowing the barge to go adrift must be chargeable to some one of

them. There is an additional circumstance requiring some comment, and it is this: The third officer of the East Indian says that the Eureka, at 8:10 a. m., was in the same position as she had been the night before, and that it was about 10 a. m. when he heard shouting among the stevedores, and noticed the barge listing heavily, and dumping her cargo. In this connection, it is the statement of Cardillo that he began to discharge cargo from No. 4 hatch about 9 a. m. At this hour therefore, it is not unreasonable to suppose that it became necessary to shift the Eureka, and, if any reliance is to be placed on the recollection of these witnesses as to the time element involved, one has an additional reason for concluding that some one of the stevedores cast off the Eureka lines. In other words, the lines were cast off when it was desirable to shift the Eureka in order to unload from No. 4 hatch. Several witnesses from the East Indian testify that they saw the disabled boat in good condition between 9 and 10 a. m., notwithstanding that the master of the Eureka says that it was but ten or fifteen minutes past 7 o'clock when he returned from breakfast and saw that the stern lines of his boat had been cast off the steamer. If he be correct in his recollection of the time, and it is thus necessary to abandon the theory that the lines were moved when the stevedores began to work No. 4 hold, the stevedores, it would seem, should still be held responsible, in that the lines were seen to have been loosened within a few minutes after the employees of Harbor Contracting Company, Inc., started to work, and they are the only persons who would have occasion to have the Eureka shifted. For this reason, my finding of fault as to the removal of the lines by an employee of the stevedoring concern will stand. But, since this company is out of existence, and unable to respond to a decree against it, it is necessary to inquire if, upon the proof, New York & Albany Lighterage Company is under liability to Hirsch Lumber Company, and to the East Indian.

■ As has been seen, the master of the Eureka was absent from his boat at the start of the trouble giving rise to this litigation. This, in and of itself, does not constitute a fault. The Kathryn B. Guinan (C. C. A.) 176 F. 301; The No. C-4 (D. C.) 300 F. 757, affirmed (C. C. A.) 300 F. 761. And, if the bargee were justified in leaving his boat to go to breakfast, as I think is true, it is difficult to find a point at which he can be said to have been negligent. When he returned to the scene of the accident, his lighter had not yet struck the ship's propeller. The Eureka was then "part of the way out from the ship: One line was in the water and the spring line was on board the boat." The lighter was too far away from the ship's side for the bargeman to get on his boat. Consequently, he went on board a New England lighter moored at the stern of the East Indian, and waiting until the Eureka was sufficiently near reached her deck. Slacking her remaining lines, which up to this time had been so taut they could not be removed from the bitts on the ship, he rigged a whip to the nearby New England lighter and endeavored to pull the Eureka alongside. This could not be done inasmuch as the lighter was found to have fouled a blade of the East Indian's starboard propeller. "Then," says the bargeman, "I tried my best to get help. I went and spoke to everybody to give me a hand with the boat * * * I went up on the ship's deck. I went along the pier, and I had some other lighter captain telephone up to the boss that I was working for. * * * I spoke to every person that I met," including a ship's officer with three stripes on his sleeve, and called to a tug for assistance. While talking with the ship's officer, the bargeman looked towards the Eureka, and saw her mast was tipped over. The officer told the bargeman not to get excited, and that he would straighten the lighter. The officer then gave some signals and the Eureka righted herself. Returning to the lighter, the bargeman went in to her hold and saw some splinters sticking up, and the water coming in. He tried to stem the inflow with a scantling and bagging, but to no avail, the barge shortly spilling her cargo onto the ship.

■ When one considers that more than an hour and a half elapsed between the time the lighter was cast adrift and that at which she became impaled, it would seem that something might well have been done to prevent the injuries which occurred. But, bearing in mind the action taken by the bargeman in the face of a situation he did not create, and coupling it with the apparent indisposition of other persons to render timely assistance, I shall not say that he was negligent. Nor do I believe that the ship or her owners should be held at fault for failure to come to the aid of the barge. Had an appeal for help been made to the officers of the East Indian before the lighter hung upon the propeller, the result, in this respect, might be different. The handling of the lighter, however, was not their duty. They had nothing to do with handling the cargo. It is doubtful, too, if they were aware of

what was happening and of the imminence of danger until after the lighter fouled the propeller. And, if their attention was not called to the need of assistance, until it was too late to render it, I feel that they should not be held at fault for not voluntarily coming to the rescue of the lighter. See the Teno (C. C. A.) 47 F.(2d) 197, 1931 A. M. C. 309, and H. J. Hinman (D. C.) 54 F.(2d) 812, 1931 A. M. C. 1899.

Also, in view of the conflict of evidence having to do with the turning of the East Indian's propeller, I am not inclined to hold that the Eureka was unnecessarily damaged in the process of her removal from the blades.

The question as to whether Ford Motor Company should have a decree against the Eureka for the damage done the propeller of the East Indian remains for decision. The recent decision of the Court of Appeals for this circuit in The Buffalo, 56 F.(2d) 738, is cited as an authority for holding the Eureka. That case is to the effect that a vessel which sinks as a result of her own unseaworthiness is under the duty of showing that she did not come in damaging contact with another craft through the negligence of the persons having the unseaworthy boat in charge. From what has heretofore been said, I think the Eureka has sufficiently rebutted the presumption of negligence raised against her. The whole trouble has its genesis when the stevedores cast off the Eureka's lines. This act created a situation which was extremely difficult for the bargeman of the Eureka to handle when called upon to confront it. While some criticism may be voiced as to the way in which he undertook to perform the task imposed upon him, I feel that he did about all that could reasonably be expected, and his failure to take more effective means to prevent injury to his cargo and to the East Indian should not be considered as negligence. It is highly unfortunate that the blameworthy parties are immune from liability, but this fact should not tend to shift the fault to another.

Furthermore, granting that the East Indian was under no duty to protect the Eureka, it is hard to escape the belief that, had the officers been thoroughly attentive to their work, they would have taken notice that the Eureka was out of control of her bargeman, and that the propeller of the East Indian was in danger as a consequence. Had they done so, all injury might easily have been avoided under such circumstances. I do not believe that the court should excessively strive to hold the Eureka.

For the reasons assigned, the damage that has occurred must rest where it fell. The libels and cross-libels will be dismissed. Each party bearing his own costs.